IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 25, 2024

## STATE OF TENNESSEE v. ISAIAH JAMAL SIMMONS

**Appeal from the Criminal Court for Hamilton County**
**Nos. 308859, 312702   Boyd M. Patterson, Judge**

_____

### No. E2023-01259-CCA-R3-CD

_____

The Defendant, Isaiah Jamal Simmons, appeals from his guilty-pleaded convictions in the Hamilton County Criminal Court for one count of attempted second degree murder, a Class B felony, aggravated stalking, a Class E felony, two counts of assault, a Class A misdemeanor, and two counts of harassment, a Class A misdemeanor. *See* T.C.A. §§ 39-13-210 (2018) (second degree murder); 39-12-101 (2018) (criminal attempt); 39-17-315 (2018) (subsequently amended) (aggravated stalking); 39-13-101 (2018) (assault); 39-17-308 (2018) (harassment). The trial court ordered the Defendant to serve his agreed-upon, ten-year sentence in confinement. On appeal, the Defendant contends the trial court abused its discretion by denying alternative sentencing and by failing to allow the defense to present argument at sentencing. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and KYLE A. HIXSON, JJ., joined.

Brandy L. Spurgin-Floyd (at plea and on appeal), Chattanooga, Tennessee, for the appellant, Isaiah Jamal Simmons.

Jonathan Skrmetti, Attorney General and Reporter; Katherine Orr, Assistant Attorney General; Coty G. Wamp, District Attorney General; and AnCharlene Davis and Bryan Starnes, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The Defendant's convictions relate to two domestic violence incidents. On May 28, 2019, the Defendant attempted to locate Briousha Price, a former girlfriend, by threatening to kill her family if they did not disclose her location. On July 2, 2021, while released on bond from the 2019 incident, the Defendant attacked Destiny Carpenter, another former

girlfriend, by punching her face repeatedly and by attempting to kill her by hitting her with his car. The Defendant was indicted in connection with the May 28, 2019 incident for one count of aggravated stalking, two counts of assault, and two counts of harassment. In a separate indictment in connection with the July 2, 2021 incident, the Defendant was charged with attempted first degree murder and one count of aggravated assault. At a consolidated hearing, the Defendant pleaded guilty to attempted second degree murder, aggravated stalking, two counts of assault, and two counts of harassment and agreed to an effective ten-year sentence with the manner of service to be determined by the trial court. The aggravated assault charge was dismissed.

At the guilty plea hearing, the prosecutor stated the following facts relative to the May 28, 2019 incident:

> . . . . Officers responded to an aggravated stalking . . . in Hamilton County. Officers spoke with the father of the victim. He stated that his daughter had been stalked by the [D]efendant, her former boyfriend[,] and he was also the father of her children.

> She had fled to an undisclosed location at the time the officers arrived due to fear for her life from [the Defendant], believing that if he found her he would kill her.

> [The Defendant] apparently had become unstable and threatened to kill the entire family. [The Defendant] went by the father's house looking for the victim in this case. The father stated that [the Defendant] came to the home banging on the windows and doors trying to find where the victim was at. The father refused to disclose the location and [the Defendant] fled the scene stating that he was going to kill them.

> [The Defendant] had called various members of the family harassing and threatening them to disclose the location of the victim. Text messages were sent to the mother of the victim. One of them stated that [the Defendant] was going to go on Facebook [L]ive and kill himself. That morning [the Defendant] posted another Facebook post on his page brandishing what was believed to be an assault style rifle along with a pistol. He pointed the rifle at the camera stating, since you all don't know s[---] you all dead, referring to the family because they would not disclose the location of the victim.

> The last text message stated that if he did not hear from the victim by a certain time that day he was going to kill the whole family, game over.

Due to the disturbing and violent posts, the victim continued to feel in danger, she feared for her life. The family also were in fear of the [D]efendant at that time.

At the guilty plea hearing, the prosecutor stated the following facts relative to the July 2, 2021 incident:

> . . . . On this date officers responded to a pedestrian being struck . . . . I should add the victim in this case was a girlfriend or had just broken up with the [D]efendant at the time of. These are two separate individuals from the first victim in the case previously announced. He was, however, on bond for the first offense when he picked up this particular case.
>
> Officers found the victim in this case had been transported to Parkridge Hospital. The witnesses stated that the victim had been run over by a man who had subsequently beat her. Officers located Ms. Carpenter, the victim, at the hospital. The [D]efendant transported her to the hospital after creating these injuries. He had run over her with his vehicle. It appeared that her legs had been broken as well as she had sustained other injuries. She was interviewed and was able to identify the suspect. There was also what appeared to be some type of stills from the area showing the vehicle of the [D]efendant.

At the sentencing hearing, the presentence report and a Day Reporting Center (DRC) report were received as exhibits. According to the presentence report, the Defendant was age twenty-eight at the time the report was prepared and had obtained a GED certificate in 2016. The report showed that the Defendant pleaded guilty to vandalism on two occasions in 2020 for which he received probation. The Defendant reported a diagnosis of bipolar schizophrenia with mood disorder, for which he had taken prescription medication previously. The Defendant described his current mental health as "good" and his physical health as "excellent." The Defendant reported that he had used alcohol "to excess," that he had a history of using marijuana, cocaine, and methamphetamines, and that he had not participated in a drug treatment program. The report stated that the Defendant had family support in Tennessee and Georgia, including a good relationship with his mother. The Defendant reported that he was not in a romantic relationship, that he did not have relationships with his three children, and that he did not pay child support. The report stated that the Defendant's most recent employment was at an automotive shop for the five years before his arrest. The risk and needs assessment found the Defendant had a "high violent overall risk."

The DRC report stated that the Defendant met the overall technical requirements for DRC eligibility and recommended that the Defendant be ordered to complete the DRC

-3-

program, continue mental health treatment, and be placed at a sober living or halfway house. The report also stated that the Defendant had misdemeanor charges with his last arrest being in July 2021.

Destiny Carpenter testified that she began a relationship with the Defendant in 2021. She said she was aware that the Defendant's relationship with Ms. Price had recently ended and that the Defendant had children with Ms. Price. Ms. Carpenter stated the Defendant would often stay with her at her mother's home. Ms. Carpenter described the relationship as "good" until the Defendant began accusing her of being interested in other men. She said that after an argument at her mother's home, the Defendant vandalized the home, breaking six windows and a flat-screen television. Ms. Carpenter stated that the Defendant moved back to his mother's home after that incident and that she stayed at the home for several days in an attempt to reconcile. When Ms. Carpenter realized that reconciliation was not possible, she left the home. She recalled that the day she left, the Defendant accused her of "looking at someone for too long" and that the Defendant became "triggered." Ms. Carpenter said, at that point, she picked up her backpack and walked out the door, returning to her mother's home, which was not far away. Ms. Carpenter said that, as she walked to her mother's home, the Defendant followed her in his car and repeatedly asked her to get into his car. Ms. Carpenter stated that as she walked on the sidewalk, the Defendant stopped his car in the middle of the road, left his car, approached her, and punched her on the face until she fell to the ground. She said that he kicked her once before returning to his car, driving onto the sidewalk, and striking her.

Ms. Carpenter testified that her injuries included approximately eighteen stitches to her foot and a broken leg. Ms. Carpenter said that after being hit by the car, she realized she could not move, her leg was "dangling," and she was in pain. She stated that the Defendant apologized, helped her to his car, and drove her to a hospital. She said that she had surgery to repair her leg and remained in the hospital for approximately two weeks, that she had to use a wheelchair for several months, and that she still felt pain, even two years after the incident. Ms. Carpenter said that she had forgiven the Defendant, that she was happy to be alive, and that she continued to "tread along."

Ms. Carpenter's medical records and photographs of her injuries were received as exhibits. The photographs depicted deep lacerations to Ms. Carpenter's foot and her bloodied face, and the x-rays showed broken leg bones.

On cross-examination, Ms. Carpenter testified that the Defendant was apologetic at the time of the incident but that she had not heard from him in approximately one and one-half years. Ms. Carpenter also questioned whether the Defendant "really mean[t] it" or "just really care[d] about his own hide." Ms. Carpenter said that when the Defendant telephoned her from jail, he was both "apologetic" and "furious."

Ms. Carpenter testified that she was not aware of the Defendant's mental health issues other than he had attended counseling previously. Ms. Carpenter stated she had recovered from her injuries. However, in response to questions from the trial court, Ms. Carpenter testified that she had residual soreness and pain and avoided "overdoing." Ms. Carpenter believed that the Defendant could easily have killed her with the car, for which he needed to be held accountable.

Former Chattanooga Police Department Special Victims' Unit Investigator John Barnett testified that he responded to a domestic violence incident on July 2, 2021, in which Ms. Carpenter had been struck by the Defendant's car. Mr. Barnett stated that he interviewed Ms. Carpenter while she was in the hospital and corroborated her account of the incident with real time intelligence center (RTIC) camera surveillance recording of the street where she was injured. The recording was received as an exhibit. As the recording was played for the court, Mr. Barnett described its contents. Mr. Barnett said that the camera scanned the neighborhood, recording different locations every few minutes and periodically zooming in to view certain areas. Mr. Barnett identified the Defendant and Ms. Carpenter and said the Defendant left his car, punched Ms. Carpenter, returned to his car, drove his car onto the sidewalk, backed the car into the middle of the road, and walked from the driver's side of the car to the sidewalk.

Mr. Barnett testified that the Defendant was not at the hospital with Ms. Carpenter. Mr. Barnett was unable to locate the Defendant for a statement until the Defendant was arrested on July 20, 2021, at which time then-investigator Barnett interviewed the Defendant. A copy of the interview was received as an exhibit and played for the court. On cross-examination, Mr. Barnett testified that the Defendant took responsibility for his behavior and acknowledged his need for mental health assistance.

In the interview after the Defendant's July 20, 2021 arrest, the Defendant stated that he had not been "in trouble" before that time and acknowledged he had "mind problems." The Defendant said that he had been diagnosed years ago with bipolar schizophrenia, that he had been prescribed medicine for that diagnosis, but that he had not taken his medication because it made him too sleepy. He stated that he understood the July 2, 2021 incident was "[his] fault," that he "messed up," and that he "needed help." The Defendant said he was mad at Ms. Carpenter because he believed she had "cheated on" him. He related that when someone made him mad, his anger built up until he "exploded." He said he "felt bad" for injuring Ms. Carpenter and wanted to be around people who could help him instead of going to jail.

Friends House Ministries Director Monty Reeves testified that he had worked with the Hamilton County Jail reentry department for three years and with the state mental health department for five years. He described Friends House as a sober living home at which participants were allowed to leave during the day for work but were required to

return in the evening, attend meetings, undertake drug testing, and obey all court requirements, including probation orders. Mr. Reeves stated that the program required a minimum of six months and utilized curriculums approved by the Tennessee Department of Correction. Mr. Reeves said that Friends House had a staff member who could manage participants with mild mental health issues but that Friends House could not accept participants who "couldn't function reasonably well in society," sex offenders, or participants who "would be dangerous to the neighborhood or the other people in the house." Mr. Reeves said that participants had been removed from the Friends House for rule violations. Mr. Reeves noted participants paid weekly rent.

Mr. Reeves testified that he had met with the Defendant weekly for approximately one year through the Friends House Ministries and the jail's reentry program and that Friends House had a place for the Defendant. Mr. Reeves stated that the Defendant understood the lifestyle changes he needed to make and was motivated to begin the program. Mr. Reeves acknowledged that he was aware of the underlying facts of the conviction offenses.

On cross-examination, Mr. Reeves testified that a participant was free to leave the facility and go anywhere between the hours of 7:00 a.m. and 10:00 p.m., assuming the participant maintained a job and attended probation meetings. Mr. Reeves affirmed that the Defendant could participate in Friends House with bipolar schizophrenia only if he regularly took his medications. Otherwise, the Defendant would be asked to leave. Mr. Reeves stated that the Defendant appeared "low key," "quiet," and "remorseful" during their meetings. Mr. Reeves surmised that the Defendant acted out of anger during the July 2021 incident.

Mr. Reeves testified that he was not aware that the Defendant had punched Ms. Carpenter's face but understood that the Defendant drove his car onto a sidewalk and struck Ms. Carpenter with his car, requiring her to be hospitalized. Mr. Reeves acknowledged that he was not aware of any of the facts regarding the May 2019 incident during which the Defendant threatened Ms. Price and her family. Mr. Reeves stated that he would still accept the Defendant at Friends House because he assumed the Defendant's violent actions were the result of methamphetamine use.

In response to a question from the trial court, Mr. Reeves testified that he was willing to take participants who were on house arrest if he determined that they were not dangerous. Mr. Reeves also affirmed that he would report to the court and to the district attorney's office if a participant violated any program requirement or rule.

The Defendant provided the following allocution:

First off I would like to apologize for the hurt that I have caused the victim and her family and I have learned a valuable lesson in life. I was wrong for what I did and no matter what they do is not worth the problems that I caused. I realized that sitting in jail taught me to have patience and helped me to control my anger. Although jail has really changed my life and saved me, I realize jail is not where I want to spend my life especially after being around people who are on the wrong path in life with no means to change for the better. I am willing to take full responsibility for my actions. I just want to be a productive citizen to the community. To rehabilitate I am getting the help that I need so that I may not make the same mistakes in the future. I am sorry once again for everything. If I were to go to prison today, I would continue to stay sober, I would get all my classes complete and work as much as possible to stay away from violence and negativity. I am not a gang member nor am I affiliated or associated with any gang. I just want to get home to my children. I would like to find a chapel to continue to grow my faith with God and I will try to get a trade of some type to help me upon my release in the future. The day I am released I will call Friends House Ministry to see if I could continue my sober living around positive people and to complete my plan of the future to ensure that my future is successful. If I were to walk out of jail today, I will first call Friends House Ministry to come pick me up and take me to the house where I would be staying at. I will immediately look for and apply for a job, something I would be a great fit for. I will cut all ties to old friends and women that would take a negative effect on my life. I will stay away from all drugs and alcohol, keeping a sober way of living. I will attend church service to stay closer with God and surround myself with positive people who encourage positivity to my future. I will go back to school, educate myself so that I may be a better father to my kids and provide more for them and the success of their future, all to the best of my ability with the help of God and other people, I believe this can be done. Thank you.

The trial court stated that it was inclined to order the Defendant to serve the full sentence in confinement with the understanding that if the Defendant filed a motion for reduction of sentence pursuant to Rule 35 of the Tennessee Rules of Criminal Procedure,[1] the court would likely release the Defendant to serve the last five years of his sentence on house arrest.

---

[1] Rule 35 of the Tennessee Rules of Criminal Procedure provides that "[t]he trial court may reduce a sentence upon motion filed within 120 days after the date the sentence is imposed or probation is revoked."

After receiving the evidence and hearing testimony, the trial court reiterated that the parties had agreed to a two-year sentence for the May 28, 2019 incident and a consecutive eight-year sentence for the July 2, 2021 incident. The court considered that the Defendant had a history of vandalism and verbal abuse. The court noted that Ms. Carpenter's injuries were "gruesome," that she was hospitalized for over two weeks, that she needed a wheelchair for two months, and that she still felt pain. The court considered the Defendant's bipolar schizophrenia diagnosis and the Defendant's acceptance of responsibility. The court noted that the Defendant's desire to reconcile with Ms. Carpenter indicated that the Defendant had irrational thoughts regarding the women who had been victims of his violence. The court also considered that the Defendant qualified for the DRC.

The trial court found confinement appropriate due to the Defendant's long history of violent criminal behavior in a domestic setting and to avoid depreciating the seriousness of the offense. In that regard, the court stated that anytime a woman ended a relationship with the Defendant, his anger escalated to violence. Accordingly, the court ordered the Defendant to serve his ten-year sentence in confinement. The court also suggested that the Defendant file a motion for a reduction in sentence. *See* Tenn. R. Crim. P. 35. If the Defendant showed a history of stable behavior and mental health, the court indicated it would likely allow the Defendant to finish his sentence on house arrest. This appeal followed.

The Defendant contends that the trial court erred by denying alternative sentencing. Specifically, the Defendant alleges that the court abused its discretion by finding the Defendant had a long history of criminal conduct, that the court improperly relied on the need not to depreciate the seriousness of the offense when denying alternative sentencing, and that the court erred by failing to allow the defense to make closing argument at the sentencing hearing. The State argues that the court acted within its discretion. We agree with the State.

The standard of review for questions related to probation or any other alternative sentence is an abuse of discretion with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278–79 (Tenn. 2012); *see State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). Generally, probation is available to a defendant sentenced to ten years or less. T.C.A. § 40-35-303(a) (2019). The burden of establishing suitability for probation rests with a defendant, who must demonstrate that probation will "'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)); *see* T.C.A. § 40-35-303(b); *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008).

A sentence is based upon "the nature of the offense and the totality of the circumstances," including a defendant's background. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *see State v. Trotter*, 201 S.W.3d 651, 653 (Tenn. 2006). A trial court is permitted to sentence a defendant who otherwise qualifies for probation or alternative sentencing to incarceration when:

> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

> (B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

> (C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C) (2019); *see Trotter*, 201 S.W.3d at 654. A trial court must consider (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the defendant's physical and mental health, and (6) the deterrence value to the defendant and others. *See State v. Trent*, 533 S.W.3d 282, 291 (Tenn. 2017) (concluding that the same factors used to determine whether to impose judicial diversion are applicable in determining whether to impose probation); *see also State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). Further, when the sole issue before the trial court is the manner of service, "information offered on the enhancement and mitigating factors is relevant to [a] determination of 'the appropriate combination of sentencing alternatives that shall be imposed on the defendant[.]'" *State v. Bolling*, 75 S.W.3d 418, 421 (Tenn. Crim. App. 2001) (citations omitted). A defendant convicted of a Class B felony is not considered a favorable candidate for alternative sentencing pursuant to Tennessee Code Annotated section § 40-35-102(6)(A) (2019).

If probation is denied solely on the basis of the circumstances of the offense, they "must be especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree," and the nature of the offense must outweigh all factors favoring a sentence other than probation. *State v. Hartley*, 818 S.W.2d 370, 374-75 (Tenn. Crim. App. 1991) (citations omitted). This court has recognized, "This standard has essentially been codified in the first part of [Tennessee Code Annotated] § 40-35-103(1)(B) which provides for confinement if it 'is necessary to avoid depreciating the seriousness of the offense.'" *Id.* at 375.

The Defendant contends the trial court erred by finding the Defendant had a long history of criminal conduct. The court found that the Defendant had a history of violent

criminal conduct. The presentence report reflects that the Defendant had two vandalism convictions, and Ms. Carpenter testified that the Defendant vandalized her mother's home only days before the Defendant attempted to kill her, though the incident was uncharged. *See State v. Mason Thomas Wilbanks and Steve A. Williams*, No. 01C01-9804-CR-00184, 1999 WL 325958, at *7 (Tenn. Crim. App. May 21, 1999) (noting that the trial court considered evidence during sentencing that the defendant previously vandalized his roommate's apartment, although the defendant was not charged with a crime). In the instant case, the Defendant threatened to kill Ms. Price and her family, stating on an internet post "since you all don't know s[---] you all dead" while pointing guns at the camera and then, while out on bond, physically assaulted and attempted to kill Ms. Carpenter by striking her with his car. The record supports the court's conclusion that the Defendant had a long history of criminal conduct.

The Defendant contends the trial court failed to make sufficient findings to deny alternative sentencing based solely on the need to avoid depreciating the seriousness of the offense. The record reflects that the court based its sentencing decision on both the Defendant's history of criminal conduct and to avoid depreciating the seriousness of the offense. The court found that the circumstances of the offense and the need to deter the Defendant from future domestic violence weighed heavily against alternative sentencing and in favor of confinement. The court was particularly concerned by the seriousness of Ms. Carpenter's injuries. The record reflects that the Defendant followed Ms. Carpenter in his car, that he left his car, that he approached Ms. Carpenter and repeatedly punched her face until she fell to the sidewalk, that he kicked her while she was on the sidewalk before returning to his car, and that he then drove his car onto the sidewalk, striking Ms. Carpenter, in an attempt to kill her. Ms. Carpenter testified that she believed she could have easily died, that she spent a lengthy stay in the hospital followed by months in a wheelchair, and that she continued to have pain.

The trial court acknowledged the Defendant's mental health issues and the Defendant's acceptance into Friends House if he were placed on house arrest. The court considered the presentence report, the risk and needs assessment, the Defendant's statements, and the Defendant's allocution. Upon review, we determine that the Defendant has failed to show an abuse of discretion. The court was heavily swayed by the Defendant's history of criminal conduct, the seriousness of the offense, and other factors. The record reflects that the court considered all the appropriate factors and stated its reasons for denying alternative sentencing. The Defendant is not entitled to relief on this basis.

The Defendant's contention that the trial court failed to allow the parties to present argument at the sentencing hearing is not supported by the evidence. The record reflects that the court indicated a possible sentencing disposition and, addressing the parties, stated, "[b]ut I would like to hear your arguments." The parties then addressed the court. At the conclusion of the State's argument, defense counsel addressed the applicability of

-10-

enhancing and mitigating factors, the Defendant's remorse and acceptance of responsibility, the Defendant's acceptance into the Friends House program, and the Defendant's eligibility for alternative sentencing. At the close of defense argument, the court asked defense counsel if she wanted to address "anything else," to which defense counsel stated, "No." The record does not support the Defendant's assertion that the trial court did not allow the defense to present argument. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE